Filed 9/12/13  P. v. Barajas CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ULISIS BARAJAS,<br><br>    Defendant and Appellant. | H037371<br>(Santa Clara County<br>Super. Ct. No. C1069517) |

A jury convicted defendant Ulisis Barajas of second degree murder and found true allegations that he (1) personally discharged a firearm causing death (Pen. Code, § 12022.53, subd. (d)--consecutive 25-year-to-life sentence enhancement),[1] and (2) committed the murder for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)--consecutive 10-year sentence enhancement).  The trial court sentenced defendant to 50 years to life (15 years to life for the murder conviction plus the 25-year and 10-year enhancements).  On appeal, defendant contends that the trial court (1) erred by overruling his objections to gang expert testimony, (2) erroneously instructed the jury in the language of CALCRIM No. 3471 (sudden-escalation exception to self-defense), (3) erred by imposing the 10-year enhancement, and (4) erred by imposing cruel and unusual punishment.  The People concede the enhancement issue and we agree that the concession is appropriate.  We otherwise reject defendant's contentions.  We therefore modify and affirm the judgment.

---

[1] Further unspecified statutory references are to the Penal Code.

## BACKGROUND

Defendant was 16 years old and a Norteno gang member. While watching television with and at the home of Sarah Benevides, a neighborhood friend and San Jose Grande gang member, he asked Benevides whether there were any Sureno gang members at a party that was in progress in a home across the street. Benevides opined that the partygoers were nongang affiliated. Later, Javier Tienda left the party to smoke a cigarette and drink a beer outside on the driveway. Defendant then left Benevides's home, crossed the street, and asked Tienda in gang slang whether Tienda was related to a gang. Tienda replied negatively. Defendant then walked back across the street to Benevides's home. There, he encountered Eduardo Alvarez who lived in Benevides's home. Alvarez asked defendant about purchasing marijuana, and defendant affirmed that they could purchase some at the corner. The two then proceeded to walk to the corner. Defendant, however, crossed the street and walked back to Tienda who had been joined by his cousin Robert Betancourt. He asked Tienda whether Tienda was still looking at him. Tienda replied that he was just smoking a cigarette and not related to a gang. When defendant continued approaching, Betancourt remarked, "I guess we are going to fight. That's what they want." He told Tienda to take the "tall guy" while he would take the "short guy." By this time, Benevides was yelling "gang related stuff" from across the street. Defendant then came towards Tienda and said "Norte" and something like "this is my neighborhood." Betancourt began arguing with defendant, and Tienda began arguing with Alvarez. Defendant put his hand into his pocket and said, "I got something for you," and Betancourt put his hands in his pocket and said, "I got something for you." The two got into fighting stances while standing two to four feet apart. Tienda and Alvarez made clear to each other that they did not want to fight. Defendant then pulled out a gun and shot Betancourt at least five times--twice in the chest, once in the back, and twice in the buttocks. Three shots were potentially fatal. Betancourt collapsed and died.

Defendant fled. The police found a closed Swiss Army knife in Betancourt's pants pocket.

Defendant relied on self-defense. He argued to the jury that he reasonably believed that he was in imminent danger of being killed or suffering great bodily injury and "used no more force than was reasonably necessary to defend against the danger." He also urged that the crime was no more than voluntary manslaughter because he (1) was provoked and acted in the heat of passion, or (2) acted in imperfect self-defense. As to imperfect self-defense, defendant urged the following: "The other possibility is you get to voluntary manslaughter by what is called imperfect self-defense. The killing of a person is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense. If the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. But there's a difference between complete and imperfect, and here's the difference. [¶] The defendant acted in perfect self-defense if the defendant actually believed he was in imminent danger of being killed or suffering great bodily based on eleven. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger, but at least one of those beliefs was unreasonable. In evaluating the defendant's beliefs consider all the circumstances that were known and appeared to the defendant. [¶] Like I said, maybe in a different part of town, maybe if it was one of us someplace in our neighborhood, we would consider it unreasonable when somebody said they got something in their pocket for you, and we wouldn't take that as a threat of imminent harm. In that neighborhood at that time of night with that situation I think that's perfectly reasonable. But one could argue you it wasn't; that he overreacted. It was unreasonable for him to believe that even though he did. That's how one would get to voluntary manslaughter from perfect self-defense. [¶] Now, the district attorney I'm sure is going to talk about this. A person who engages in mutual combat who is the initial aggressor has a right to self-defense only if he actually and in good faith tries to stop the fighting and

3

indicates by word or conduct to his opponent in a way that a reasonable person would understand that he wants to stop fighting or that he has stopped fighting, and he gives the opponent a chance to stop fighting. I will tell you that did not happen here. I will agree that did not happen. [¶] There's more to that instruction. If you decide that the defendant started the fight using non-deadly force, another fist fight, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and is not required to stop fighting. That threat to him was real. That I'm going to my pocket and I got something for you, he knew what that meant. He wasn't going to wait around is it a gun, is it a knife, is it a machete? At that point he decided to defend himself. So whether he was in mutual combat or whether he was the aggressor, he doesn't have to stand there and get shot or stabbed before he can do something. That's what that instruction tells you. [¶] I'm sure the district attorney will also tell you that a person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force. What that really means you can't intend to go out and kill someone. You can't intend to go out and shoot and stab someone and pretend like you are not. You know, engage in a little fight, cause him to get mad at you. Oh, he got mad at me. I have to shoot him. Again, that's not what happened here. The fact that he engaged Tienda and nothing happened there. It wasn't until Mr. Bettancourt [*sic*] decided to mutually escalate this, that force came into play. [¶] The right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws and no longer appears capable of inflicting an injury, then the right to use force ends. So, again, if this wasn't self-defense, if this was premeditated, he meant to do it or an intent to hurt him, then he wouldn't have withdrew. He withdrew as he was firing the gun and he ran down the street. If that not [*sic*] what he meant, he would have walked over and pumped the rest of the gun into him. Clear as day. If you really intended to do a murder, you are going to do a murder."

4

The prosecutor replied that self-defense did not apply because defendant was the aggressor and faced no immediate danger from Betancourt. He added that there was no mutual combat because no witness testified that Betancourt displayed a knife or advanced toward defendant.

<u>GANG EXPERT TESTIMONY</u>

During in limine proceedings, defendant objected to a packet of material for a PowerPoint[2] presentation by the People's gang expert for the purpose of proving the street-gang allegation. According to defendant, (1) "much of the material that's in this presentation is irrelevant. Some of it is conclusionary"; (2) "And also there's hearsay and confrontation problems with this"; and (3) "Most of this would be in many ways a well orchestrated propaganda piece to unduly influence the minds of the jurors and to put them in a state of agitation where they won't be able to see clearly." Defendant also urged that information in the PowerPoint about Benevides was unnecessary because Benevides was no longer a defendant in the case and other evidence would prove that she was a gang member and a relative of defendant. The trial court took defendant's request under submission while it reviewed the PowerPoint presentation.

When the trial court revisited the issue, defendant elaborated on his objection.

Defendant first argued that the evidence "shouldn't be coming in at all" because it violated his Sixth Amendment right of confrontation as articulated in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). "Because we are not going to have an officer who gets up here and brings in the gang members who told him the information he's showing to us. He's not going to get people involved in the predicate crimes or the crimes he read about or the police reports he read about to have their opinions and their

---

[2] PowerPoint is a computer software presentation program that is used to display frames (or slides) of text or images onto a screen. The slides are advanced using a remote control device. As the parties referred to the program by its product or brand name, for convenience we do the same.

5

statements tested under the crucible of cross-examination. He's coming in with some vague, I've talked to a lot gangs members, went through crime reports, I've talked to a lot of police officers, I've been through a lot of training, and based on that I can give you my opinion on this, this, and that. Well, those items he's basing it on, the predicate offenses, the statements of other gangs [*sic*] members are all statement [*sic*] made for the truth of the matter stated as evidence against my client and under *Crawford* they should not be permitted before the Court unless I've had the opportunity to confront them."

The trial court overruled defendant's objection: "[E]xpert testimony may encompass the following, and is proper as it relates to gang sociology and psychology and the expectations of gang members when confronted with certain situations. The necessity to establish the existence, composition, culture, habits and activities of street gangs, the defendant's membership, gang rivalries[,] the motivation for criminal behavior, retaliation, intimidation, and whether or not the defendant committed the crime for the benefit of or to promote the gang. The statements of the basis of the opinion of the expert will not [be] received for the truth. [¶] . . . [T]he Court will allow this testimony of the expert regarding gang membership, validation, and the way crimes are committed and whether this one was committed for the benefit for or to promote the gang. Therefore, the request to exclude that testimony is denied."

Defendant next urged that "a lot of material that the gang expert is going to present seems to be irrelevant. It seems to be gilding the lily as they say. Both the slide show and the packet of stuff he gave me has a litany of very serious offenses and sort of, what's the word I'm looking for, sort of heightened fearful images of gangsters and gangs and what they do and how dangerous they are, and it talks about them in generalities like they are all just one group. If you are a gangster, if you are a sub group, you all act this way and they all do that and they all do this. [¶] And a lot of what is in this presentation is irrelevant to [defendant]. There's no evidence that he was involved in any of those acts that they are going to bring in. Drugs, running women, running violent car jacks, violent

6

robberies, and assaults of people. They are going to go on and on and on and fill the jury's mind these are also gang members and they are all one group. Like taking one race, one religion or one ethic [*sic*] origin and say these people are all like that. [¶] . . . [¶] . . . There are very few slides except the slides around Page 20 that aren't general Nortenos are a big group, and they are all bad. It isn't until 20 or 25 slide in that they actually talk about Sanders Street and East San Jose and the gangs in that area and what the relevance is to this case, to [defendant], and to this crime. The first 10 or 15 slides are all about the badness of this Norteno umbrella group. And I think it is over the top. I think there are gangsters who range all the way from tagging crews to sophisticated extortionists and car jackers and violent robbers. But it runs the gamut. [¶] And what this particular presentation does, it doesn't give it any credence, just says gangs are this violent, ugly group and they are all the same. There's a picture in one of the slides of an alleged gangster pointing his gun right at the person who is looking at the picture. It's almost as if he's pointing the gun at you. The presentation is made to have a visceral effect on the jury, to get them scared and not to give them information, but almost to overwhelm their intellectual, academic thinking process and put them in an emotional fearful process. [¶] . . . I think the gang expert could come in, talk about [defendant], talk about the local street gangs in that area, talk about the association with those members and get the same effect without this highly prejudicial emotional response to the jury, oh, look at that gangster, they're all bad gangs. He's a gang member. . . . It's not geared to inform. It's geared to influence our emotions, and I would ask he be limited to what he can use and say and much of it--it's a PowerPoint presentation--be stricken, and I have individual slides I want to go into."

Defendant then made specific objections to most of the PowerPoint slides. After the People agreed to remove or redact certain slides and the trial court ordered removal of certain slides, the trial court overruled defendant's objection. It explained as follows: "And according to case law, as I said earlier, the expert can say all the things that are on

the slides. It's just in this particular case the People have added photographs to go with it, and they have photographs because [p]eople are taking photographs of themselves with their gangs and using them. Since the police can say all of this and I don't find that the pictures are prejudicial, they are just showing actual people with the things they do, and in the poses that they take, and showing off their tattoos. They're related to Nortenos, which is the umbrella group to the gang that the defendant was accused of being in, and that the opposing group, the Surenos, which I don't know if the victim was a member of Surenos, but the issue was surrounding whether or not he was in the other group. So the photographs are relevant to the expert's testimony, and will be allowed, the ones that I have said can be used. I find that any prejudice issues is not outweighed by the probative value."

San Jose Police Detective Michael Wittingham testified as a criminal street gang expert. He opined that the homicide and firearm allegation were committed for the benefit of and in association with the criminal street gang known as Norteno with the intent to further promote and assist the conduct by criminal street gang members. He added that the basis of this opinion was "when somebody yells norte they are going for the notoriety, they want the respect. So yelling norte prior to the assault or going up to someone and saying do you bang, that is for the benefit of the street gang. By going up and saying your gang's name, I'm doing this for so and so, and it let's everybody know Norteno committed the assault, this was done for the benefit of Nortenos. The fact that we have a long documented history for Sarah Benevides and we also have a documented history, although not as long, for [defendant], the two of them together walk up to together where [defendant]-- [Defense objection.] [¶] . . . [¶] In association with, as I've gone over, if you have two people, using the hypothetical two people, who go up to a victim together, say the words do you bang, norte, are you a scrap, any of those challenging phrases, that is in association with the gang." He further testified that a criminal street gang was defined by section 186.22, subdivision (f), and is a formal or

informal group of "three or more people who have a common name, sign, or symbol whose members have engaged in a pattern of criminal activity . . . enumerated in the 186.22 section." He described Benevides's gang affiliation, moniker, tattoos, and associates as well as her police encounters and those of her associates. He opined about the general role of females in gangs as being drug carriers, information conduits, and alibi providers. He related the history of the Mexican Mafia and Nuestra Familia prison gangs and the characteristics of the Sureno gang. And he used the PowerPoint presentation to illustrate his testimony.

During the testimony, defendant repeated his objections from the in limine proceedings as follows: "Now that we've actually seen part of the presentation of the expert witness from the San Jose Police Department, I want to just renew my objections. I feel this has gone far afield of what the expert has relied upon to make opinions and become a lecture, almost a class for the jury. I feel this is over the top, prejudice from the mentioning of existing cases that have nothing to do with my client, prior instances that we have no documentation of that have nothing to do with my client. Much more prejudicial than probative and overbroad and is not designed to help the jury elicit information they are not familiar with to make their decision. I think it's more to influence the jury."

Confrontation Objection

Defendant contends that admission of Detective Wittingham's opinion testimony--to the extent that it was based on information obtained from (1) unnamed police officers who spoke with unnamed gang members, and (2) lists of supposed gang members who supposedly associated with defendant--violated his Sixth Amendment right to confrontation as defined by the United States Supreme Court in *Crawford*. We disagree.

Under *Crawford*, and the later decision of *Davis v. Washington* (2006) 547 U.S. 813, the admission of testimonial out-of-court statements is barred by the confrontation

9

clause of the Sixth Amendment unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.

There is nothing in *Crawford* or *Davis* that prohibits a gang expert from relying on hearsay as a basis for his or her opinions. (See, e.g., *People v. Ramirez* (2007) 153 Cal.App.4th 1422 (*Ramirez*); *People v. Fulcher* (2006) 136 Cal.App.4th 41, 56-57; *People v. Thomas* (2005) 130 Cal.App.4th 1202 (*Thomas*).) "The rule is long established in California that experts may testify as to their opinions on relevant matters and, if questioned, may relate the information and sources on which they relied in forming those opinions. Such sources may include hearsay." (*Thomas*, *supra*, at p. 1209, citing *People v. Gardeley* (1996) 14 Cal.4th 605, 618-619; Evid. Code, § 801, subd. (b).) *Crawford* does not undermine this established rule. (*Thomas*, *supra*, at p. 1210.) Since a gang expert "is subject to cross-examination about his or her opinions," and "the materials on which the expert bases his or her opinion are not elicited for the truth of their contents" but rather "are examined to assess the weight of the expert's opinion," this evidence does not offend the Sixth Amendment. (*Ibid*.) "Hearsay in support of expert opinion is simply not the sort of testimonial hearsay the use of which *Crawford* condemned." (*Ramirez*, *supra*, at p. 1427, citing *Thomas*, *supra*, at p. 1210.) The confrontation clause " 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' " (*Thomas*, *supra*, at p. 1210, quoting *Crawford*, *supra*, 541 U.S. at p. 59.)

"Because an expert's need to consider extrajudicial matters, and a jury's need for information sufficient to evaluate an expert opinion, may conflict with an accused's interest in avoiding substantive use of unreliable hearsay, disputes in this area must generally be left to the trial court's sound judgment." (*People v. Montiel* (1993) 5 Cal.4th 877, 919.) The trial court may exclude from an expert's opinion testimony any hearsay matter if its probative value is outweighed by its irrelevance, unreliability, or potential prejudice. (*People v. Catlin* (2001) 26 Cal.4th 81, 137.)

10

We believe *Ramirez* and *Thomas* are decided correctly.  There is no Sixth Amendment violation.

Defendant asserts that the hearsay on which Detective Wittingham relied were in fact offered for the truth of the matters asserted.  Not so.

The trial court instructed the jury that anything Detective Wittingham "is relaying to you that was told to him by others is being received just to show the information that the officer has and what he relied on in forming his opinions, but they are not to be accepted by you for the truth of what was stated."  On another occasion during the testimony, the trial court admonished, "Members of the jury, this is not being offered for the truth. . . .  It is only offered to show why the officer is forming the opinion that he has and it's the basis of the statements given to you, but it is not for the truth of what was said to him."  And the trial court also formally instructed the jury in the language of CALCRIM No. 360 as follows:  "Experts testified that in reaching their conclusions as an expert witness they considered statements made by others.  You may consider those statements only to evaluate the expert's opinion.  Do not consider those statements as proof that the information contained in the statement is true."  These instructions adequately informed the jury of the evidentiary limitations of the challenged testimony.[3]

---

[3] They also adequately informed the jury of the evidentiary limitations of the PowerPoint presentation.  Defendant parses out the PowerPoint presentation and claims that the jury was entitled to consider the PowerPoint for all purposes because the trial court did not give a limiting instruction when it admitted the PowerPoint hard copies into evidence as plaintiff's exhibit No. 46.  But the trial court gave the jury neither exhibit No. 46 nor the court's exhibit A, the PowerPoint DVD, which was also admitted into evidence, and the jury presumably did not consider the PowerPoint presentation except during Detective Willingham's testimony.  Defendant fails to explain why the jury would have been misled toward considering the PowerPoint for all purposes--contrary to the limiting instructions applicable to Detective Willingham's testimony--when the PowerPoint presentation was used simply to accompany and illustrate Detective Willingham's testimony.

Objections To Testimony

Defendant next contends that the trial court erred by allowing Detective Wittingham to opine on defendant's specific intent (for the benefit of and in association with the criminal street gang with the intent to further promote and assist) rather than give an opinion in the form of a hypothetical question.

We agree with the People that defendant has forfeited the issue by failing to make objection below on the specific ground he states here. (Evid. Code, § 353; *People v. Hood* (1997) 53 Cal.App.4th 965, 970 [the defendant "asserted none of these [objections] below, and, therefore, [forfeited] them"].)

It is true, as defendant urges, that he voiced objections to Detective Wittingham's testimony during the in limine proceedings. But it is also true that he did not make then-- or at the time of the testimony--objection on the ground that Detective Wittingham was opining on an ultimate issue rather than opining hypothetically. Evidence Code section 353 does not require any particular form of objection or motion--only that the presentation contain a specific request to exclude specific evidence on the specific legal ground urged on appeal. (*People v. Morris* (1991) 53 Cal.3d 152, 188 (*Morris*).) A motion in limine satisfies the requirements of Evidence Code section 353 when it states the same specific legal ground later raised on appeal, the motion is directed to a particular, identifiable body of evidence and "the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context." (*Morris*, *supra*, at p. 190.) If each of these requirements is not satisfied, a contemporaneous objection must be made to preserve the evidentiary issue for appeal. (*Ibid.*)

Defendant next argues that the trial court erred by allowing Detective Wittingham to give a hypothetical opinion without an evidentiary basis. He refers to the testimony where Detective Wittingham began to infer that defendant and Benevides walked up together and yelled "norte" before the murder.

12

We again agree that defendant has forfeited the point. Defendant objected to the trial testimony on the ground that Detective Wittingham was "in essence summarizing conflicting testimony about what happened." But he made no objection on the ground that the proffered opinion had no evidentiary basis. In any event, he fails to demonstrate any prejudice. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Defendant made his objection before Detective Wittingham finished his answer. In response to the objection, the trial court admonished the jury that the facts forming the basis for the opinion were not offered for the truth. Thereafter, as recounted above, Detective Wittingham finished his answer in the form of a hypothetical without reference to Benevides.

Defendant also contends that Detective Wittingham improperly opined on the definition of a criminal street gang. Again, defendant failed to object to this testimony on the ground stated here. In any event, defendant fails to demonstrate prejudice because Detective Wittingham made clear that the Penal Code defined the concept. And the trial court later instructed the jury on section 186.22 in the language of CALCRIM No. 1401.

Defendant next contends that the trial court erred by overruling his objection on Evidence Code section 352 grounds to the evidence about Benevides and female gang members.[4]

Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

The admission of gang-affiliation evidence over an Evidence Code section 352 objection is a matter within the trial court's sound discretion, and this decision will not be

---

[4] Defendant objected to the Benevides evidence in general and with reference to specific PowerPoint slides during the in limine proceeding. He objected to the female-gang evidence with reference to specific PowerPoint slides.

13

disturbed on appeal unless the admission of the evidence exceeded the bounds of reason. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369.) "A decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' [Citations.] In the absence of a clear showing that its decision was arbitrary or irrational, a trial court should be presumed to have acted to achieve legitimate objectives and, accordingly, its discretionary determinations ought not be set aside on review." (*People v. Preyer* (1985) 164 Cal.App.3d 568, 573-574.) This rule requires that the reviewing court engage in all intendments and presumptions in support of the decision and consider the evidence in a light most favorable to the prevailing party. (*People v. Condley* (1977) 69 Cal.App.3d 999, 1015.) It also requires that the party claiming abuse of discretion affirmatively establish the point. (*Smith v. Smith* (1969) 1 Cal.App.3d 952, 958.)

There is no bright-line rule for the admissibility of gang affiliation evidence; the question is usually fact-specific and, as such, peculiarly one for the trial court's discretion. Our task is simply to determine whether the trial court could have rationally concluded that the probative value of the evidence outweighed the prejudicial effect.

According to defendant, the Benevides and female-gang evidence was irrelevant or had limited probative value because (1) "Wittingham did not need to explain the basis of his opinion that Benevides was a gang member by relating information about gang members known to Benevides [because] Benevides's gang affiliation was not in dispute," and (2) evidence about the general role of females in gangs "was not useful," had no tendency in reason to prove that Benevides was a gang member or defendant committed the crime in association with Benevides, and was cumulative to the evidence establishing that Benevides was a gang member. Defendant urges that the evidence was more prejudicial than probative because the evidence about gang members unrelated to defendant or the charged offense would confuse the jury about the narrow role the evidence should play in the trial and mislead the jury to use it for broader, improper

14

purposes. He adds that it was inflammatory because it portrayed the individuals as uniquely vulgar and violent without evidence that defendant or Benevides engaged in the type of behavior portrayed.

As is apparent, defendant manifestly fails to carry his appellate burden. He merely reargues his position rather than focuses on the factors supporting the trial court's decision and explains why it was irrational to rely on those factors.

In any event, it was not irrational for the trial court to conclude that the Benevides and female-gang evidence had substantial probative value. Defendant himself concedes that "Evidence that Benevides was a gang member was relevant because it had a tendency to prove that, based on their friendship, [defendant] was also gang affiliated." A prosecutor is generally entitled to tell his or her story with the most persuasive and forceful evidence. (*People v. Scheid* (1997) 16 Cal.4th 1, 16-17.) " 'Evidence that is identical in subject matter to other evidence should not be excluded as "cumulative" when it has greater evidentiary weight or probative value.' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 669.)

Here, the trial court could have rationally concluded that the evidence about Benevides's gang associates had greater evidentiary weight than the evidence highlighted by defendant, such as Benevides's undisputed gang affiliation, gang moniker, gang tattoos, and the like. It could also have rationally concluded that the general female-gang evidence had probative value as expert testimony about the " 'culture and habits' " of criminal street gangs. (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 657, disapproved on another point in *People v. Vang* (2011) 52 Cal.4th 1038, 1050, fn. 5.)[5]

As to the prejudice prong, " 'The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a

---

[5] Detective Wittingham testified that females in gangs "play a very important role in gang culture."

defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 958.) In other words, "Evidence Code section 352 is designed for situations in which evidence of little evidentiary impact evokes an emotional [prejudice]." (*People v. Olguin*, *supra*, 31 Cal.App.4th at p. 1369.)

But whether evidence is so outrageous so as to shock the emotions of a jury into using the evidence improperly is a highly subjective determination. In the ordinary case such as this one, the question provokes a difference of opinion rather than exposes irrationality. Here, the trial court could have rationally concluded that the Benevides and female-gang evidence had enough probative value as to outweigh any emotional prejudice or that any emotional prejudice from the evidence was negligible in light of the limiting instructions given in the case.[6]

Defendant also complains about Detective Wittingham's testimony relating the history of the Mexican Mafia and Nuestra Familia prison gangs and the characteristics of the Sureno gang. We address the point in the context of defendant's specific objections to PowerPoint slides.

Objections to PowerPoint Slides

Defendant complains on appeal about the admission of the following PowerPoint slides over his Evidence Code section 352 objections.

---

[6] In addition to the admonitions and instruction about considering the expert testimony, the trial court also instructed the jury in the language of CALCRIM No. 1403 as follows: "You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose, and knowledge that was required to prove the gang related enhancement charge. You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

Slide 1:  This slide superimposes on a San Jose Police Department seal the date of the killing, the word "Homicide," and "187 PC."  Defendant urged that the slide presented improper opinion evidence to the jury:  that the homicide was a murder as opposed to manslaughter or justifiable homicide by reason of self defense.

Slide 3:  Defendant made no cognizable objection to this slide ("I have no objection to 3 where they impart real information").

Slide 4:  This slide is entitled "Criminal Activity" and lists several criminal offenses such as "187 PC-Homicide," "215 PC-Carjacking," and "245 PC-ADW," and has a photograph of firearms, drugs, and money.  Defendant argued that he was not involved in what the slide depicted and the intention of the evidence was to scare the jury.

Slide 5:  Defendant made no objection to this slide.

Slides 6-9:  Slide 6 is entitled "Violence" and lists underneath the words "NECESSARY," "Glamorized in gang life," "Acceptable/expected behavior in GANGS," "Controls members/community," "Enhances a gangs reputation or 'street credibility' among gangsters, even rivals," and "Sense of fear among neighbors/community."  Slide 7 is entitled "Weapons" and lists underneath the words "NECESSARY," "Protection from enemies or rival gang members (Don't want to be caught 'slippin')," "Enhances a gangs reputation," "Retaliation Missions," and " 'Work' (Crime) Missions."  Defendant claimed that "this is not geared towards imparting real information.  It's geared towards affecting their emotions."  Defendant made no objections to slides 8 and 9.

Slide 13:  This slide is entitled "Females in Gangs" and lists underneath--along with four photographs of female gang members--the words "Vital Role to the Gang," "Drug 'Mules,' " "Hold firearms," "Communication Network (Prison, County)," "Provide housing (Section 8)," "Provide Alibis," and "Frustrate Law Enforcement."  Defendant objected on the ground that there was no evidence that Benevides gave

17

defendant a gun and the evidence would allow the prosecutor to "make a back door argument" that Benevides gave defendant a gun.

Slide 15: This slide shows photographs of women, drugs, weapons, money, and a man with a red bandanna and a Norte hat pointing a gun at the viewer. Defendant urged that "There's no way to connect him to any of these type of crimes unless you say all gangsters do all these things all the time."

Slides 16-22 and 25: Slides 16 through 22 depict images of Sureno gang members, symbols, slogans, drawings, clothing, and photographs of tattooed Sureno gang members using drugs and flashing gang signs. One slide is entitled "Mexican Mafia" and describes the group as "Predominant Prison Gang in California." Slide 25 is entitled "Nuestra Familia" and describes how the gang "was originally formed for protection purposes from the Mexican Mafia," the hatred between the groups, and the struggle for power that evolved in Nuestra Familia's "participation in criminal activities in an effort to control the introduction of contraband into the facilities." According to defendant, the trial court should have sanitized and limited these slides because they "created a narrative designed to incite the passions of the jury."

Slide 24: Defendant made no objection to this slide.

Slide 34: This slide is entitled "Gang Members Affiliating Photographs w/Handsigns" and is a photograph of Norteno gang members, several of whom are displaying a middle finger that, defendant urged, was not a gang sign.

Slides 37-43, 44-58, 60-66, 68-77: These slides depict what defendant characterizes as "mug shot photographs" of him, Benevides, seven of his gang associates, and 10 of Benevides's gang associates. They also show police identification cards. The "mug shot" and identification-card slides have various case numbers displayed. One card records that defendant admitted being a Norteno gang member. One slide shows a contact report and states that defendant was "arrested while affiliating with other Gang members and displaying Gang Tattoos." Another slide shows a "mug shot" of a gang

18

member, denotes that he was murdered, and shows a photograph of gang members at the gravesite. Defendant argued that the slides not only implied that he had a criminal record but also suggested that he had committed serious offenses such as those listed in the earlier slides. He also urged that the information about Benevides and his and her associates was unnecessary and "leaves a false impression . . . with the jurors" about "whether they are associates or not."

On appeal, defendant also contends that he received ineffective assistance of counsel because his trial counsel failed to object to "well over 30" of the PowerPoint photographs for lack of authentication.

As noted in *People v. Ruiz* (1998) 62 Cal.App.4th 234 (*Ruiz*), "California courts have long recognized the potential prejudicial effect of gang membership evidence." (*Id.* at p. 239.) "Due to its potential prejudicial impact on a jury, our Supreme Court has condemned the introduction of 'evidence of gang membership if only tangentially relevant, given its highly inflammatory impact.' " (*Id.* at p. 240, quoting from *People v. Cox* (1991) 53 Cal.3d 618, 660, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) It should not be admitted if its only purpose is to prove defendant's criminal disposition or bad character in order to create an inference defendant committed the charged offenses. (*Ruiz*, *supra*, at p. 240; accord, Evid. Code, § 1101, subd. (a).)

When gang evidence meets the test of relevancy, however, it is admissible unless its prejudicial effect clearly outweighs its probative value. (*People v. Carter* (2003) 30 Cal.4th 1166, 1194.)

The trial court properly admits evidence pertaining to gangs and gang membership when the evidence is relevant to a material issue at trial, such as "when the very reason for the crime is gang related." (*Ruiz*, *supra*, 62 Cal.App.4th at p. 239.)

Defendant recognizes, as he must, that gang evidence was admissible in this case to prove the gang enhancement.

19

We, nevertheless, are troubled by the excessive volume of the gang evidence and its potential for prejudice. Some of the gang evidence presented was irrelevant, cumulative, and risked undue prejudice, as the trial court ruled in some instances. It bears emphasizing the obvious that trial courts must be careful to use their powers under Evidence Code section 352 to limit gang evidence to its proper purpose, for example, establishing the existence of a criminal street gang, and not to permit an overzealous prosecutor, through the guise of establishing that fact, to seek to improperly imply to the jury that, since the gang is violent, the defendant is violent and therefore likely guilty of the charged crimes.

Might there have been gang evidence admitted in the PowerPoint presentation which should have been excluded under Evidence Code section 352 as lacking significant probative value, or as redundant, or as unduly time consuming, or as more prejudicial than probative. There might have been. However, the erroneous admission of such evidence in this instance does not require reversal of the judgment unless it was reasonably probable that the defendant would have obtained a more favorable result had there been no error. (*People v. Earp* (1999) 20 Cal.4th 826, 878.) Considering the overwhelming circumstances in this case, we are confident that the PowerPoint slides, shown to the jury, did not constitute prejudicial error. The potential prejudice of overzealous prosecution tactics actually was rendered moot here by the strong evidence against defendant in the record.

The evidence of defendant's guilt, of his gang membership, and of the gang relatedness of the crimes was overwhelming. Defendant shot Betancourt five times. No one testified that Betancourt displayed a knife. Alvarez testified that he saw Betancourt put his hands in his pockets and then take his hands out of his pockets with nothing in his hands. The police found Betancourt's knife closed in his pocket. No reasonable jury would believe that Betancourt provoked defendant so as to reduce the homicide from murder to manslaughter or justify the homicide as committed in self-defense. Moreover,

20

there was no dispute that defendant and Benevides were gang members. And Benevides testified that defendant asked her whether any Southern California gang members were at the party across the street. Also, Tienda testified that (1) Benevides was yelling "gang related stuff" when defendant came towards him and Betancourt, and (2) defendant said "Norte" and "this is my neighborhood" when defendant came towards him and Betancourt. More specifically, Alvarez testified that defendant challenged Betancourt by saying, "This is Norte gang, mother fucker." Alvarez also testified that, after defendant shot Betancourt, Benevides joined defendant at the scene and exclaimed, "That's what you get." There is no reasonable probability that the jury would have returned a more favorable verdict as to the gang enhancement had the trial court sustained defendant's objections to the PowerPoint evidence. The same holds true had trial counsel made a successful objection to PowerPoint evidence on the ground of lack of authentication. (*Strickland v. Washington* (1984) 466 U.S. 668, 697; *In re Jackson* (1992) 3 Cal.4th 578, 604 [when an ineffective assistance claim can be resolved solely on the absence of prejudice there is no need to determine whether counsel's alleged failings constituted deficient performance].)

Nonetheless, defendant claims that the admission of the gang evidence transgressed his due process right to a fair trial. We disagree.

"The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment." (*Estelle v. Williams* (1976) 425 U.S. 501, 503 (*Estelle*).) The presumption that a defendant is innocent until proven guilty "is a basic component of a fair trial under our system of criminal justice." (*Ibid.*) To assure the presumption of innocence applies, "courts must be alert to factors that may undermine the fairness of the factfinding process [and] must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." (*Ibid.*)

We realize there are courtroom practices that are so detrimental to the presumption of innocence that they violate a defendant's due process rights. For example, compelling

21

a defendant to appear at a jury trial in prison clothing is improper. (*Estelle*, *supra*, 425 U.S. at pp. 504-505.) Unwarranted shackling or gagging of a defendant during trial also is impermissible. (*Illinois v. Allen* (1970) 397 U.S. 337, 345.) Use of an excessive number of security personnel in a courtroom also can damage the presumption of innocence. (*Holbrook v. Flynn* (1986) 475 U.S. 560, 567-568; *Estelle*, *supra*, at p. 505.)

Although "certain courtroom practices are so inherently prejudicial that they deprive the defendant of a fair trial" (*Carey v. Musladin* (2006) 549 U.S. 70, 72), what happened in defendant's trial--either singularly or cumulatively--did not come close to such a description. Defendant was not required to wear jail clothing, nor was he shackled or gagged during the trial. The presumption of innocence was not undercut.

Considered singularly or together, we find that the gang evidence was not unduly suggestive of guilt. Defendant's claim to the contrary is based on conjecture and underestimates the capability of jurors to follow the trial court's instructions. Defendant's trial was not unfair. The evidentiary rulings he challenges concerned relevant evidence, unlike the situations in *Illinois v. Allen*, *supra*, 397 U.S. 337; *Estelle*, *supra*, 425 U.S. 50l; and *Coy v. Iowa* (1988) 487 U.S. 1012. "Lengthy criminal trials are rarely perfect . . . ." (*People v. Hill* (1998) 17 Cal.4th 800, 844.)

Defendant relies on *People v. Albarran* (2007) 149 Cal.App.4th 214, but that case is distinguishable. There, the court found it prejudicial error to admit extensive gang evidence in a murder case. It explained that the case presented "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair." (*Id*. at p. 232.) The unusual posture arose because the trial court had granted defendant's motion for a new trial as to a gang allegation for insufficient evidence but denied the motion as to the substantive charge. Under the circumstances, the court held that, rather than showing motive and intent, the gang evidence served only to inflame the jury and show defendant's dangerous and criminal disposition. (*Id.* at p. 230.)

Here the gang evidence was relevant to establishing the gang enhancements. The evidence in support of the homicide and enhancements was ample, and defendant does not challenge the sufficiency on appeal.[7]

## CALCRIM NO. 3471

The trial court instructed the jury in the language of CALCRIM No. 3471 as follows: "A person who engages in mutual combat or who is the initial aggressor has a right to self-defense only if, one, he actually and in good faith tries to stop fighting; and indicates by word or conduct to his opponent in a way that a reasonable person would understand that he wants to stop fighting and he has stopped fighting. And, three, he gives his opponent a chance to stop fighting. If a person meets these requirements, he then has a right to self-defense if the opponent continues to fight. [¶] A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied, and must occur before the claim to self-defense arose. [¶] *If you decide that the defendant started fighting using non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight*, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting." (Italics added.)

Defendant contends that the given instruction was erroneous because the italicized language (the "sudden escalation exception") "omitted the principle that mutual combatants may avail themselves of the 'sudden escalation exception' to the doctrine conditionally barring self-defense." He notes that the current version of CALCRIM No. 3471 encompasses both mutual combatants and initial aggressors for purposes of the "sudden escalation exception."[8] According to defendant, "it was the defense theory that

---

[7] Defendant's application for later transmittal of court exhibit is denied.

[8] The "sudden escalation exception" in the current version of CALCRIM No. 3471 reads as follows: "However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not (continued)

23

[defendant] acted in self-defense only after Bettencourt [*sic*] escalated the non lethal fist fight to a deadly encounter through the threatened use of the knife in his pocket." Defendant urges that, under the given instruction, the jury would not have considered the "sudden escalation exception" if it found that there was a mutual-combat scenario.

We disagree with defendant's analysis.

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review. [Citation.] Review of the adequacy of instruction is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.] . . . 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

In deciding whether instructional error occurred, we "assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." (*People v. Mills* (1991) 1 Cal.App.4th 898, 918.) In that context, we then "determine whether it is reasonably likely the jurors understood the instruction[s] as [defendant] suggests. [Citation.] In making that determination, we must consider several factors including the language of the instruction[s] in question [citation], the record of the trial [citation], and the arguments of counsel." (*People v. Nem* (2003) 114 Cal.App.4th 160, 165.) Even if we conclude that " 'a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' " (*People v. Hernandez* (2003) 111 Cal.App.4th 582, 589.) Even if we conclude that a jury instruction is erroneous, the error "requires reversal only when it

---

withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting (or) communicate the desire to stop the opponent [or give the opponent a chance to stop fighting]."

24

appears that the error was likely to have misled the jury." (*People v. Owens* (1994) 27 Cal.App.4th 1155, 1159.)

Here, the trial record, the language of the instructions, and the closing arguments in this case show that it is not reasonably likely that the jurors (1) understood CALCRIM No. 3471 in the way defendant urges, or (2) were misled by an erroneous CALCRIM No. 3471.

First, the "sudden escalation exception" part of CALCRIM No. 3471 is, at worst, ambiguous. It states: "If you decide that the defendant started fighting using non deadly force . . . ." The phrase could refer to either (1) defendant's level of force when a reciprocal exchange of blows began (a mutual-combat scenario), (2) defendant's role as the one who started the fight (an initial-aggressor scenario), or (3) both.

Second, the conditional self-defense bar about which CALCRIM No. 3471 instructs applies to both mutual combatants and initial aggressors. The instruction begins: "A person who engages in mutual combat or who is the initial aggressor." Since the instruction as a whole applies to both, it would be anomalous to understand the ambiguous "sudden escalation exception" within the instruction as applying to initial aggressors only.

Third, defense counsel argued the case as if the "sudden escalation exception" applied to both mutual combatants and initial aggressors: "So whether he was in mutual combat or whether he was the aggressor, he doesn't have to stand there and get shot or stabbed before he can do something."

And fourth, the jury likely never had occasion to understand the "sudden escalation exception" in the way defendant urges. Defendant's premise is based on the supposition that the jury could have found a mutual-combat scenario. But we disagree that this is possible. Defendant sought out and engaged Betancourt. No witness saw Betancourt make any threatening move toward defendant or display any weapon. At most, the two verbally threatened each other (I've got something for you) while poised to

25

fight (fighting stances).  No reasonable juror would conclude that this scenario is mutual combat.  (*People v. Ross* (2007) 155 Cal.App.4th 1033 (*Ross*).)

In *Ross*, the defendant had been invited by a friend to move into a trailer already occupied by the friend, his girlfriend, her four young children, and her mother.  The girlfriend was unhappy with the arrangement.  Her visiting friend, the victim, got into a shouting match with the defendant and told him, " ' "Fuck you." ' "  (*Ross*, *supra*, 155 Cal.App.4th at p. 1037.)  The defendant told her to watch her language around the children, and a heated exchange ensued, which lasted for several minutes.  Ultimately, the defendant told the victim, " ' "You sound like an old whore" ' " or " 'a fucking whore.' "  (*Id.* at p. 1038.)  She slapped him and then hit him again.  He struck back, although the witnesses gave different accounts of how hard and how many times the defendant struck the victim.

On these facts, the court had occasion to examine what mutual combat means, particularly because the trial court refused the jury's request for a definition of the phrase.  We agree with the court that "[l]ike many legal phrases, 'mutual combat' has a dangerously vivid quality.  The danger lies in the power of vivid language to mask ambiguity and even inaccuracy.  [Fn. omitted.]  Here the jury was told that participation in 'mutual combat' conditionally bars the participants from pleading self-defense if either is prosecuted for assaulting the other.  [Fn. omitted.]  The 'combat' element of this rule is clear enough, at least for present purposes.  It suggests two (or more) persons fighting, whether by fencing with swords, having a go at fisticuffs, slashing at one another with switchblades, or facing off with six-guns on the dusty streets of fabled Dodge City.  The trouble arises from 'mutual.'  When, for these purposes, is combat 'mutual'?  What distinguishes 'mutual' combat from combat in which one of the participants retains an unconditional right of self-defense?"  (*Ross*, *supra*, 155 Cal.App.4th at pp. 1043-1044.)

Culled from a distinguished line of cases, the court held that " 'mutual combat' means not merely a reciprocal exchange of blows but one *pursuant to mutual intention*,

26

*consent, or agreement preceding the initiation of hostilities.*" (*Ross*, *supra*, 155 Cal.App.4th at p. 1045.) One who voluntarily engages in mutual combat must attempt to withdraw from it before he is justified in killing an adversary to save himself. "Mutual combat," as it relates to self-defense, is a fight " '*begun or continued by mutual consent or agreement, express or implied.*' " (*Ibid.*)

The court concluded, "We do not believe any reasonable juror faced with this evidence could conclude beyond a reasonable doubt that defendant and [the victim] at any time mutually agreed, consented, arranged, or intended to fight one another. Instead the evidence strongly suggests that the parties exchanged contemptuous remarks until [the victim] lost her temper and slapped defendant, whereupon he punched her back. [Fn. omitted.] This is not 'mutual combat' as that term has been explicated in California precedents. This does not mean that defendant was legally entitled to punch [the victim]. That was and remains a legitimate question for the jury. But the answer must hinge on whether defendant responded with reasonable force to avert a threat of violence against his person. There is no adequate basis here for a finding that defendant was at any time engaged in mutual combat with [the victim]." (*Ross*, *supra*, 155 Cal.App.4th at p. 1054.)

The same logic is more compelling in this case because there was no reciprocal exchange of blows and, thus, no combat.

Defendant also contends that the given instruction was erroneous because the prefatory language in the "sudden escalation exception" ("If you decide that the defendant started fighting using non-deadly force") "failed to convey to the jury that the 'sudden escalation exception' applies to initial aggressors who do not employ force before the need to defend arises." He argues that "a person need not use force for the initial aggressor doctrine to apply." He cites *People v. Hecker* (1895) 109 Cal. 451, 463, for the proposition that a person can be an initial aggressor simply by creating an appearance justifying another's counterattack.

We again disagree with defendant's analysis.

27

An aggressor is someone "who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.) Thus, an "aggressor" necessarily uses some form of force even in the "appearance" scenario. (§ 240 ["An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."]; *People v. Bradbury* (1907) 151 Cal. 675, 676-677 [" 'The "violent injury" here mentioned is not synonymous with "bodily harm," but includes any wrongful act committed by means of physical force against the person of another, even although only the feelings of such person are injured by the act. The term "violence" as used here is synonymous with "physical force," and in relation to assaults the two terms are used interchangeably. . . . "The kind of physical force is immaterial." ' "]; *People v. Flummerfelt* (1957) 153 Cal.App.2d 104, 106 ["The terms 'violence' and 'force' are synonymous when used in relation to assault."]; *People v. Lipscomb* (1993) 17 Cal.App.4th 564, 570 [a person who creates an appearance justifying a counterattack commits an assault]; see *People v. Ausbie* (2004) 123 Cal.App.4th 855, 860, fn. 2 ["The degree of force necessary for a simple assault is identical to that needed for a simple battery."], disapproved on other grounds in *People v. Reed* (2006) 38 Cal.4th 1224, 1228 and in *People v. Santana* (2013) 56 Cal.4th 999, 1011.) In short, defendant's concept of a nonforcible aggressor is anomalous.

The instruction was not erroneous.

<u>TEN-YEAR SENTENCE ENHANCEMENT</u>

As we have stated, the trial court sentenced defendant to 15 years to life for the murder conviction, enhanced by 25 years to life for the firearm allegation finding and 10 years for the gang allegation finding.

Defendant contends that the 10-year gang enhancement was imposed in error and must be stricken. The People properly concede the error.

Section 186.22, subdivision (b), establishes alternative methods for punishing felons whose crimes were committed for the benefit of a criminal street gang. Section 186.22, subdivision (b)(1)(C) imposes a 10-year enhancement when the felony is a violent felony, as defined by section 667.5, subdivision (c). That provision imposing a 10-year enhancement, however, does not apply where the violent felony is "punishable by imprisonment in the state prison for life." (§ 186.22, subd. (b)(5).) In that situation, section 186.22, subdivision (b)(5), applies and imposes a minimum term of 15 years before the defendant may be considered for parole.

In *People v. Lopez* (2005) 34 Cal.4th 1002 (*Lopez*), the defendant was convicted of first degree murder, and the jury found true both gang and personal use of firearm allegations. The trial court sentenced defendant to 25 years to life for murder, 25 years to life for the firearm allegation, and 10 years for the gang allegation. (*Id.* at p. 1005.) On appeal, the defendant contended that the 10-year enhancement must be stricken because of section 186.22, subdivision (b)(5); he argued that under the plain language of the statute the sentence for first degree murder was a life term. (*Lopez*, *supra*, at p. 1006.) The People disagreed, arguing that section 186.22, subdivision (b)(5) applied only to straight life terms, and not to first or second degree murder. (*Lopez*, *supra*, at p. 1007.) Our Supreme Court agreed with the defendant, finding that " ' "imprisonment in the state prison for life" ' " included both a straight life term as well as a term of years to life. (*Ibid.*) The high court ordered the sentence modified to delete the 10-year gang enhancement imposed under section 186.22, subdivision (b)(1)(C). (*Lopez*, *supra*, at p. 1011.) We shall order the same modification.

CRUEL AND/OR UNUSUAL PUNISHMENT

Defendant argues that his sentence constitutes cruel and/or unusual punishment under the federal and state Constitutions. (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.) We disagree.

29

A sentence constitutes cruel and unusual punishment under the Eighth Amendment if it is grossly disproportionate to the severity of the crime. (*Ewing v. California* (2003) 538 U.S. 11, 20; *Rummel v. Estelle* (1980) 445 U.S. 263, 271.) Similarly, a sentence is cruel or unusual under California law if it is so disproportionate to the crime as to shock the conscience and offend fundamental notions of dignity. (*In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*); *People v. Dillon* (1983) 34 Cal.3d 441, 478 (*Dillon*).)

Defendant relies on a number of United States Supreme Court cases and a recent California Supreme Court case for the proposition that the imposition of his (now reduced) 40-years-to-life sentence is categorically unconstitutional under the Eighth Amendment because he was a juvenile when he committed the offense and the trial court imposed the sentence pursuant to a mandatory sentencing scheme that resulted in a de facto life-without-possibility-of-parole (LWOP) sentence.

But all of the cases are distinguishable from this one because they involved juveniles whose sentences were either: (1) death (*Roper v. Simmons* (2005) 543 U.S. 551, 578-579), (2) LWOP (*Miller v. Alabama* (2012) __ U.S. __ [132 S.Ct. 2455, 2460] [2012 U.S. LEXIS 4873]; *Graham v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2014, 2020] [2010 U.S. LEXIS 3881]), or (3) a term of years so long as to be the functional equivalent of LWOP (*People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*)). As the Fourth District recently explained, the cases dealing with the permissible length of a juvenile offender's sentence "follow a remarkably consistent pattern. There is a bright line between LWOPs and long sentences *with* eligibility for parole *if* there is some meaningful life expectancy left when the offender becomes eligible for parole. We are aware of--and have been cited to--no case which has used the *Roper-Graham-Miller-Caballero* line of jurisprudence to strike down as cruel and unusual any sentence against anyone under the age of 18 where the perpetrator still has substantial life expectancy left

at the time of eligibility for parole." (*People v. Perez* (2013) 214 Cal.App.4th 49, 57 (*Perez*).)

In *Perez*, the court rejected an Eighth Amendment challenge by a 16-year-old defendant who had been sentenced to a term of 30 years to life in prison. The court acknowledged that "[h]ow *much* life expectancy must remain at the time of eligibility for parole of course remains a matter for future judicial development," (*Perez*, *supra*, 214 Cal.App.4th at p. 57) but because the defendant in that case would be eligible for parole when he reached age 47, it held "there is plenty of time left for Perez to demonstrate, as the *Graham* court put it, 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " (*Id.* at pp. 57-58.) Because the defendant's sentence could not be considered a " 'functional' " or " 'de facto' " LWOP, neither *Miller*, *Graham*, nor *Caballero* applied, and *Roper* did not apply because it was a death penalty case. (*Id.* at p. 58.)

This case is similar to *Perez*. Defendant, who was 16 at the time of his offense, was sentenced (after our modification) to a total of 40 years to life and was given 1,085 days of credit for time served. Defendant concedes that he will become eligible for parole at age 56, long before the end of his life expectancy.[9] Like the juvenile defendant in *Perez*, defendant will have ample time to obtain release based on demonstrated maturity and rehabilitation. "That is, by no stretch of the imagination can this case be called a 'functional' or 'de facto' LWOP . . . ." (*Perez*, *supra*, 214 Cal.App.4th at p. 58.) Thus, for the reasons stated in *Perez*, we conclude that the *Roper-Graham-Miller-Caballero* line of cases does not assist defendant.

---

[9] Defendant cites publications that fix his life expectancy "anywhere from 71 to 74 years." He claims that prison life reduces life expectancy and his reduction results in a life expectancy "likely less than 66 years of age."

31

Nor do they assist defendant with his argument that his sentence violates the Eighth Amendment simply because it was mandatory[10] and therefore failed to account in any way for the fact that he was a juvenile at the time of the offense.

This argument is based on the recognition by the *Roper-Graham-Miller-Caballero* line of cases of the diminished culpability that results from minors' immaturity. And here again, we find *Perez* instructive. The defendant in that case contended that "California's one strike law is unconstitutional as applied to minors because it deprives trial courts of the discretion to take into account what the *Miller* and *Roper* majorities described as the 'what "any parent knows" ' factor."[11] (*Perez, supra*, 214 Cal.App.4th at p. 58.) The *Perez* court rejected the argument because the *Roper-Graham-Miller* line of cases concerned juvenile "offenders [who] had been exposed to the 'harshest' available sentence." (*Id.* at p. 59.) Unlike *Roper, Graham*, and *Miller, Perez* was not an LWOP case and the state's most severe penalties were not at stake. (*Ibid.*) The *Perez* court refused to fashion "a judicially imposed rule of mandatory discretion, namely that no matter how heinous the crime--*or how mild the penalty otherwise imposed on adults*--the federal and state cruel and unusual punishment clauses require states to hold out some possibility of discretionary reduction in *that* penalty to take into account an offender's youth." (*Ibid.*) It went on to note that "at the moment at least, no high court has

---

[10] With exceptions not applicable here, every person convicted of second degree murder "shall be punished by imprisonment in the state prison for a term of 15 years to life." (§ 190, subd. (a).) Any person found to have personally and intentionally discharged a firearm proximately causing great bodily injury during commission of specified felonies "shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." (§ 12022.53, subd. (d).)

[11] The quoted language is taken from *Roper*, which explained that "as any parent knows . . , '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.' " (*Roper, supra*, 543 U.S. at p. 569.)

articulated a rule that *all* minors who commit adult crimes and who would otherwise be sentenced as adults *must* have the opportunity for some discretionary reduction in their sentence by the trial court to account for their youth.  Perez's sentence, albeit long, still leaves plenty of time for him to be eligible for parole.  It passes constitutional muster." (*Ibid.*)

Defendant likewise offers no case authority holding that all minors must have the opportunity for a discretionary reduction in their sentences based on their youth.  Current law contains no such requirement, and it seems to us that creation of such a requirement is a matter best left to the Legislature.  (*Perez*, *supra*, 214 Cal.App.4th at p. 59; see *Caballero*, *supra*, 55 Cal.4th at p. 269, fn. 5 [urging Legislature to establish parole eligibility mechanism for defendants serving de facto LWOP sentences for nonhomicide crimes committed as juveniles].)  Like the defendant in *Perez*, defendant's sentence, while long, leaves him ample time to be eligible for parole.  We therefore disagree with defendant that his sentence offends the Eighth Amendment.  (See *Perez*, *supra*, at p. 59.)

Finally, quite apart from *Miller*, *Graham*, *Roper* or *Caballero*, defendant asserts that his sentence must be reduced under the older California Supreme Court jurisprudence of gross disproportionality, as shown primarily in *Lynch* and *Dillon*.  In *Lynch*, the court suggested three areas of focus:  (1) the nature of the offense and the offender; (2) a comparison with the punishment imposed for more serious crimes in the same jurisdiction; and (3) a comparison with the punishment imposed for the same offense in different jurisdictions.  (*Lynch*, *supra*, 8 Cal.3d at pp. 425-427.)  Disproportionality need not be established in all three areas.  (*Dillon*, *supra*, 34 Cal.3d at p. 487, fn. 38.)

Defendant limits his focus to the nature-of-the-offense and nature-of-the-offender factor.  (*Dillon*, *supra*, 34 Cal.3d at p. 479.)

Concerning the nature of the offense, we must consider both the nature of the offense in the abstract and the facts of the crime in the particular case, including factors

such as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences. (*Dillon*, *supra*, 34 Cal.3d at p. 479.) Concerning the nature of the offender, the question is whether the punishment is "grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Ibid.*)

The record must be viewed in the light most favorable to the sentence (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496), and defendant must overcome a considerable burden to convince us that his sentence is disproportionate. (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196-1197.)

Successful challenges based on the traditional *Lynch-Dillon* line are extremely rare. (See *People v. Weddle*, *supra*, 1 Cal.App.4th at p. 1196 ["exquisite rarity"]; *In re Nuñez* (2009) 173 Cal.App.4th 709, 725 ["rarest of the rare"].) It happened in *Nuñez*, but that was a case where a 14-year-old was given a full LWOP for a nonhomicide crime, with the court successfully anticipating what the federal Supreme Court would soon hand down in *Miller*. It also happened in 2005, in *People v. Carmony* (2005) 127 Cal.App.4th 1066, but that was a case of a 25-year-to-life sentence for--certainly in comparison to the present case--the relatively trivial crime of failing to register as a sex offender within five working days of the offender's birthday. Likewise, *Lynch* also involved a life term for a crime that pales in comparison to the present one, second-offense indecent exposure. And *Dillon*--while certainly not a minor crime in comparison to the offense here (in *Dillon* it was felony murder)--was a case that, like *Nuñez*, successfully anticipated what the federal Supreme Court would later do. Specifically, in *Dillon* our Supreme Court was simply some 27 years ahead of *Graham* (no LWOPs for minors, even in homicide cases).

The present case certainly is not among those "exquisitely rare" cases which merit reversal on traditional disproportionality review.

Looking at the offense in the abstract, California courts have regularly observed that murder ranks among the most serious crimes. (See, e.g., *People v. Brown* (1996) 42

34

Cal.App.4th 461, 478 [" 'murder has always been recognized as the most serious of crimes.' "]; *Williams v. Superior Court* (1983) 34 Cal.3d 584, 593 ["murder [is] . . . one of the most serious offenses, even when special circumstances are not alleged."].)  In *Graham*, the United States Supreme Court likewise stated that homicide ranks among the most serious crimes.  The court stated:  "There is a line 'between homicide and other serious violent offenses against the individual.'  [Citation.]  Serious nonhomicide crimes 'may be devastating in their harm . . . but "in terms of moral depravity and of the injury to the person and to the public," . . . they cannot be compared to murder in their "severity and irrevocability." '  [Citations.]  This is because '[l]ife is over for the victim of the murderer,' but for the victim of even a very serious nonhomicide crime, 'life . . . is not over and normally is not beyond repair.'  [Citation.]  Although an offense like robbery or rape is 'a serious crime deserving serious punishment,' [citation], those crimes differ from homicide crimes in a moral sense." (*Graham*, *supra*, 560 U.S. at p. __ [130 S.Ct. at p. 2027].)

California courts have also recognized that a violation of section 12022.53 makes a crime even more serious.  As the court explained in *People v. Martinez, supra*, 76 Cal.App.4th at pages 497 through 498, "[T]he Legislature determined in enacting section 12022.53 that the use of firearms in commission of the designated felonies is such a danger that, 'substantially longer prison sentences must be imposed . . . in order to protect our citizens and to deter violent crime.'  The ease with which a victim of one of the enumerated felonies could be killed or injured if a firearm is involved clearly supports a legislative distinction treating firearm offenses more harshly than the same crimes committed by other means, in order to deter the use of firearms and save lives."

California courts have upheld consecutive terms for murder and for firearm use enhancements (see *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1215-1216 [25 years to life for murder and a consecutive 25 years to life for a section 12022.53 enhancement was not cruel and unusual punishment]), even as applied to juveniles (*People v. Em*

35

(2009) 171 Cal.App.4th 964, 972-978 [50-years-to-life sentence for committing murder with a firearm imposed on 15-year-old defendant was constitutional]; *People v. Demirdjian* (2006) 144 Cal.App.4th 10, 12-13 [same]).  In *People v. Gonzales* (2001) 87 Cal.App.4th 1, although the court found other errors requiring reversal and resentencing, the court rejected the challenge of two 16-year-olds and a 14-year-old that their sentences of 50 years to life in prison for murder were cruel and unusual punishment.  (*Id.* at pp. 16-19.)  As to the 14-year-old defendant, the court stated:  "While Jimenez's youth and incidental criminal history are factors in his favor, they are substantially outweighed by the seriousness of the crime and the circumstances surrounding its commission . . . .  The lack of a significant prior criminal record is not determinative in a cruel and unusual punishment analysis.  [Citation.]  Jimenez poses a great danger to society.  Under the circumstances of this case, the sentence is not grossly disproportionate to the crime and does not constitute cruel and unusual punishment."  (*Id.* at p. 17.)  And in *People v. Blackwell* (2011) 202 Cal.App.4th 144, 156-157, the court affirmed an LWOP sentence imposed on a defendant who committed felony murder at age 17.

Looking at the instant offense factually, we do not hesitate to conclude that the murder was inexplicably horrendous, particularly when we take into account (1) Benevides's advice that there were no rival gang members across the street, (2) defendant's first trip across the street that presumably confirmed Benevides's advice, (3) defendant's second trip across the street to nevertheless provoke a gang-related fight, and (4) defendant's cold-blooded shooting of the victim who did no more than stand ready to fight.  In short, defendant's culpability was anything but trivial and, obviously, most significant in our evaluation of the nature of the offense must be that the consequence of the crime was the victim's death.

As to the nature of the offender, defendant asks us to give principal consideration to his youth, traumatic childhood, and scant criminal record ("no prior adult criminal history and no serious juvenile criminal record beyond engaging in school fistfights").

But, even taking these factors into consideration, we nonetheless conclude that defendant's willful, deliberate murder was not a youthful indiscretion of an immature mind, but a deliberate, conscious attempt to take a human life by an evil and malicious mind, warranting the punishment he received. At 16 years old, defendant was a gun-toting gang member who disregarded advice against going across the street to look for rival gangsters to fight and ultimately "fought" by repeatedly shooting someone who was only poised for a fistfight. Youthful immaturity does not begin to explain such a senseless crime. As offered by the probation officer: "The defendant murdered the victim for no apparent reason other than perceived gang affiliation. His actions in the present case were callous, and resulted in the victim's senseless death." There are no significant extenuating circumstances here. Defendant was not goaded into the crime by peer pressure or other external influences. The crime did not result from any provocation by the victim or from any real or perceived wrong done to defendant. Defendant's self-defense justification for the killing shows no remorse and is preposterous when we take into account that (1) no one saw Betancourt display a knife, (2) Alvarez saw Betancourt pull empty hands from his pockets, (3) Betancourt's knife was found closed in his pocket, and (4) defendant shot Betancourt five times. Defendant was old and mature enough to fully understand the nature of his conduct and the consequences for it.

In these circumstances, we cannot conclude that the sentence in defendant's case is the type of "exquisite rarity" that will support a successful proportionality challenge. (*People v. Weddle*, *supra*, 1 Cal.App.4th at p. 1196.)

Defendant's punishment does not violate the prohibitions against cruel and/or unusual punishment under either the federal or California Constitutions.

## DISPOSITION

The 10-year gang enhancement to defendant's count 1 conviction for second degree murder is stricken and replaced with the 15-year minimum parole eligibility under

37

Penal Code section 186.22, subdivision (b)(1)(C).  As so modified, the judgment is affirmed.

 

 

_____

                                          Premo, J.

WE CONCUR:

_____

           Rushing, P.J.

_____

           Elia, J.