[No. E035829. Fourth Dist., Div. Two. June 10, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
MELVIN HIRAM THOMAS II, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for partial publication, publishing only FACTS AND PROCEDURAL BACKGROUND, DISCUSSION, C. Admission of Hearsay Evidence of Gang Membership, and DISPOSITION.

**COUNSEL**

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Pamela A. Ratner Sobeck and Bradley A. Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HOLLENHORST, J.—**

### INTRODUCTION[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### FACTS AND PROCEDURAL BACKGROUND

In the evening of May 15, 2003, Brian Morrell parked his pickup truck on the street in front of Judith Barrera's house. Barrera was in the backyard

---

[*]See footnote, *ante*, page 1202.

when she heard a man yell, "F--- you, guys. E.Y.C."[2] Barrera ran to the front of her house where she saw codefendant Joseph Atilano Johnson get out of the front passenger seat of a car, jump into Morrell's pickup, and drive off. Defendant, who had been in the backseat of the car, climbed into the front passenger seat where Johnson had been sitting. Barrera recognized both defendant and Johnson because they had driven by her house in the same car a few hours earlier.

Barrera got into her own car to try to find Johnson and the truck. Ten or 15 minutes after the truck had been taken, she spotted it near a convenience store about a mile and a half from her house. Barrera and her aunt, who was with her in the car, saw Johnson pushing the truck toward the gas pumps at the convenience store. Both women testified they saw defendant get out of the passenger seat of the truck and enter the convenience store.

Barrera yelled out, "That's our truck." Johnson called defendant out of the convenience store, and the two men walked away. Barrera called 911. Johnson and defendant started running into a field at the back of the convenience store. After a search of the field, a deputy sheriff found defendant and Johnson at 7:45 or 8:00 p.m., lying on their stomachs and concealed by weeds.

Deputy Sheriff Donovan Brooks arrested defendant and Johnson. At the jail, defendant asked Brooks why they had been arrested, and Brooks said it was for stealing a truck. Johnson stated that he had seen the truck rolling down the street with the keys in it, so he jumped in and took off in it. Brooks told them that because someone had yelled out, "F--- you, E.Y.C.," they were also facing a gang enhancement. Johnson said that defendant had not even been there when he, Johnson, had yelled out that remark.

Riverside Sheriff's Officer Robert Kwan testified as a gang expert. Kwan described the structure of the different cliques within E.Y.C. as follows: "They have the P.W.L.'s, which is the Pee-Wee Locos, the kids in the elementary school levels. They have the Tiny Winos, which is between 12 and 18 years old, which their acronym is T.W.S., and then they have the Nite Owls, which are the guys that are 18 and older." Kwan testified that E.Y.C. was primarily a Hispanic gang, although some of the members were White. The primary activities of E.Y.C. ranged "from graffiti to robbery, to burglary, to attempt murder, up to murder" as well as stealing cars.

In Kwan's opinion, both defendant and Johnson were members of E.Y.C., and the crime was committed for the benefit of the E.Y.C. Kwan based his

---

[2] A gang expert testified that "E.Y.C." was an acronym for the Elsinore Young Classics gang, and Morrell was a known member of the Elsinore Vatos Locos (E.V.L.) gang, a rival of E.Y.C.

opinion that defendant was a member of the gang on Kwan's "training and experience, reports written where he [was] a suspect, times [Kwan had] contacted him being in the presence of other gang members, when he was caught with Mr. Johnson; also with—that day being caught with another gang member." Kwan testified that he had known defendant "to admit to commit other crimes with other gang members." Specifically, Kwan referred to a 1992 robbery in which defendant and other gang members had stolen "some bikes and hats off some kids." In February 2002, when searching a house for an E.Y.C. member who was an attempted murder suspect, Kwan found defendant hiding in a concealed basement. Moreover, Kwan had seen an incident report that indicated that defendant had been present at a knife fight or stabbing in 1995 involving another E.Y.C. member, although defendant had not been charged with any crime in connection with that incident.

Defendant had numerous gang-related tattoos: "He's got 'Elsinore' on his neck, on his eyebrow; 'Y.C.' on his eyebrow; 'P.W.L.' on his head underneath his hair; 'Y.C.' on the back of his head. 'P.W.L.' on his arms; 'E.Y.C.' across his whole midsection and chest. Numerous other tattoos depicting 'South Side' or 'I.E.'; 'SUR,' S-U-R, 'Y.C.' on his hands." Defendant had the number "13"[3] tattooed on his arm; "Thug" tattooed on his back; "Elsinore" tattooed on his back, and another tattoo stating "Brand."[4] Another tattoo on his arm stated " '909' depicting . . . area code; that he's from the Inland Empire." He had "Brown Pride" on his arm. Defendant's head had been shaved when he was arrested so the tattoos on the back and side of his head were fully visible. In Kwan's opinion, that meant defendant was still active in the gang; otherwise, he would have grown his hair out to conceal the tattoos.

Kwan testified that he had talked with other E.Y.C. members about defendant, and they had told him that defendant was a member of E.Y.C. and that defendant's moniker was "Little Casper" or "Villain." Kwan had also talked with members of rival gangs about defendant's membership in E.Y.C.

In Kwan's opinion, based on his training and experience, the current crimes were committed for the benefit of E.Y.C. because the crimes caused fear and intimidation on rival gang members. A week before the pickup was

---

[3] Kwan explained the significance of the "13" tattoo: "In the Hispanic gang culture, . . . the 13th letter of the alphabet is M, which is the EME. [T]he EME runs the southern faction of the prison system, in the state prison system. The northern . . . is run by a group called a 'Nuestro Familia.' And if you are from the north, you will tattoo a 14. If you are from the southern, you will tattoo 13, showing your affiliation to what they call 'South Side Surenos.' "

[4] Kwan testified that "Brand" was "in association with EME gang members." However, he later testified that he had been mistaken; the tattoo stated, "Brandy," and it was common for people to have their girlfriends' names as tattoos. Moreover, the "Brand" tattoo was connected with the Aryan Brotherhood, and someone who had a "Brown Pride" tattoo probably would not be in the Aryan Brotherhood.

taken, the graffito "Grizzly" had appeared on the fence next door to Barrera's house; "Grizzly" was Johnson's gang moniker.

On cross-examination, Kwan conceded that defendant did not appear in the photographs of E.Y.C. gang members that were introduced into evidence. Moreover, Kwan was not aware of any recent crimes defendant had committed, although he knew that defendant had committed crimes 11 and nine years ago and had had a seven-year prison term.[5] Kwan testified that defendant was about 30 years old, and E.Y.C. was "predominantly geared towards younger age groups." Kwan testified on cross-examination that much of his expertise concerning Elsinore gangs had been provided by other Elsinore officers and deputies as well as by speaking with E.Y.C. gang members.

Kwan described conversations with gang members concerning defendant: "[J]ust a lot of consensual conversation, you know. We just started talking and names get thrown out on who's who and monikers and—." Kwan testified that he had not documented those conversations. The only record he had in his file concerning defendant was about the February 2002 contact when defendant was found hiding in a concealed basement. Kwan did not have any field identification cards for defendant. There was no record that defendant had bragged about committing any crimes. Defendant had not been charged with any gang enhancement in connection with the prior robbery.

The jury found defendant guilty of receiving stolen property in count 2 (Pen. Code, § 496, subd. (a); all further statutory references are to the Penal Code unless otherwise specified) and of active participation in a criminal street gang (§ 186.22, subd. (a)); however, the jury found him not guilty of vehicle theft in count 1.[6] In bifurcated proceedings, the jury found true the allegations that defendant had suffered a prior prison term (§ 667.5, subd. (c)(5)); two prior serious convictions (§ 667, subd. (a)) and three strike priors (§§ 667, subds. (c), (e), 1170.12, subd. (c)(2)(A)).

The trial court exercised its discretion to strike two of defendant's strike priors with respect to count 2 and sentenced defendant on count 2 to the aggravated term of six years as a second strike. However, the trial court refused to strike any of the priors with respect to count 3 and sentenced defendant to a concurrent term of 25 years to life plus an additional and consecutive five-year term for each of the two serious felony priors for a total sentence of 35 years to life.

---

[5] Kwan later testified that defendant had actually been sentenced to a four-year term and had served two years.

[6] Codefendant Johnson was found guilty on count 1 and the jury returned a true finding on the allegation that the crime had been committed for the benefit of a criminal street gang.

## DISCUSSION

A., B.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### C. *Admission of Hearsay Evidence of Gang Membership*

Citing *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*), defendant contends that his right to confront witnesses was violated by the admission of hearsay evidence in the form of the gang expert's conversations with other gang members in which they identified defendant as a gang member. Deputy Kwan testified that he learned through casual, undocumented conversations with other gang members that defendant was a member of E.Y.C., and his gang moniker was "Little Casper" or "Villain."

#### 1. *Waiver*

The People contend that defendant waived the issue by failing to raise an objection in the trial court on the basis now urged on appeal. However, because *Crawford* was decided after the trial in this case, we conclude that the failure to object was excusable. (*People v. Johnson* (2004) 121 Cal.App.4th 1409, 1411, fn. 2 [18 Cal.Rptr.3d 230].) We will therefore address the issue on the merits.

#### 2. *Analysis*

■ In all criminal prosecutions, the accused has a right, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, "to be confronted with the witnesses against him . . . ." (U.S. Const., Amend. 6; *Pointer v. Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065].) The central concern of the Sixth Amendment's confrontation clause is "to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." (*Maryland v. Craig* (1990) 497 U.S. 836, 845 [111 L.Ed.2d 666, 110 S.Ct. 3157].)

■ In *Crawford*, the Supreme Court held that out-of-court statements that are testimonial in nature are inadmissible unless the declarant is unavailable and the accused has had a prior opportunity to cross-examine the declarant. In *Crawford*, therefore, the court held that a wife's out-of-court statement to an

---

[*]See footnote, *ante*, page 1202.

officer during a custodial interrogation about a knife fight, in which both the husband and wife were suspects, could not be used against the husband in his trial for attempted murder. (*Crawford, supra,* 541 U.S. 36 at pp. 68–69 [158 L.Ed.2d 177, 124 S.Ct. 1354].)

The *Crawford* court stated, however, that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does [*Ohio v.*] *Roberts* [(1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531]], and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether . . . . We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' " (*Crawford, supra,* 541 U.S. at p. 68 [124 S.Ct. 1354, 1374], fn. omitted].) The court nonetheless provided illustrations of statements that could be considered testimonial: (1) " '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' " and (2) " 'statements . . . made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " (*Id.* at p. 52 [124 S.Ct. at p. 1364].)

Few published California cases have yet addressed the scope of *Crawford*'s limitation on the use of hearsay evidence,[8] and none of those cases has analyzed the use of hearsay as the basis for an expert witness's opinion. Defendant argues, however, that the statements on which Kwan relied were testimonial, and therefore inadmissible, because when the officer inquired about gang membership, he "was obviously gathering information which he intended to use and in fact did use in at least one criminal prosecution that being the instant case."

██ The rule is long established in California that experts may testify as to their opinions on relevant matters and, if questioned, may relate the information and sources on which they relied in forming those opinions. Such sources may include hearsay. (See *People v. Gardeley* (1996) 14 Cal.4th 605, 618–619 [59 Cal.Rptr.2d 356, 927 P.2d 713]; Evid. Code, § 801, subd. (b) [an expert's opinion may be based on matter "whether or not admissible, that is

---

[8] The California Supreme Court has granted review in several cases addressing various *Crawford* issues: *People v. Harless,* review granted Mar. 23, 2005, S131011█; *People v. Kilday,* review granted Jan. 19, 2005, S129567; *People v. Caudillo,* review granted January 12, 2005, S129212; *People v. Ochoa,* review granted Nov. 17, 2004, S128417; *People v. Adams,* review granted Oct. 13, 2004, S127373; *People v. Cage,* review granted Oct. 13, 2004, S127344; *People v. Seijas,* review granted May 19, 2004, S123790█.

of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates"].) In *People v. Vy* (2004) 122 Cal.App.4th 1209, 1223, footnote 10 [19 Cal.Rptr.3d 402], the court stated, "Of course, because the culture and habits of gangs are matters which are 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact' (Evid. Code, § 801, subd. (a)), opinion testimony from a gang expert, subject to the limitations applicable to expert testimony generally, is proper. [Citation.] Such an expert—like other experts—may give opinion testimony that is based upon hearsay, including conversations with gang members as well as with the defendant. [Citations.] Such opinions may also be based upon the expert's personal investigation of past crimes by gang members and information about gangs learned from the expert's colleagues or from other law enforcement agencies. [Citations.]"

■ *Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion. *Crawford* itself states that the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Crawford, supra,* 541 U.S. at p. 59 [124 S.Ct. at p. 1369, fn. 9], citing *Tennessee v. Street* (1985) 471 U.S. 409, 414 [85 L.Ed.2d 425, 105 S.Ct. 2078].)

Here, the conversations with other gang members were mentioned only as a basis for Kwan's opinion that defendant was a gang member. There was no Sixth Amendment violation based on Kwan's reliance on hearsay matters.

Moreover, although no published California case has yet addressed whether *Crawford* applies to hearsay statements that are used not as direct evidence against the defendant but merely as the basis for an expert's opinion, courts in other jurisdictions have held upheld such use. (See *People v. Goldstein* (2004) 14 A.D.3d 32, 38 [786 N.Y.S.2d 428, 432]; *Howard v. Walker* (W.D.N.Y., July 21, 2004, No. 98-CV-6427FE) 2004 WL 1638197, 2004 U.S. Dist. Lexis 14425; *United States v. Stone* (E.D.Tenn., 2004) 222 F.R.D. 334.)

Thus, because the statements were not offered to establish the truth of the matter asserted, but merely as one of the bases for an expert witness's opinion, the confrontation clause, as interpreted in *Crawford*, does not apply. There was no error in the use of the hearsay statements.

D. *Conviction of Section 186.22, Subdivision (a) as a Serious Felony*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Ramirez, P. J., and Ward, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 12, 2005.

---

[*]See footnote, *ante*, page 1202.